# CASE NO. 24-1650(L)

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES, *et al.*,
*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

ON APPEAL FROM THE
FEDERAL ENERGY REGULATORY COMMISSION

## OPENING BRIEF OF PUBLIC INTEREST
## ORGANIZATIONS AND INVENERGY PETITIONERS

| | |
|---|---|
| */s/ Danielle Fidler*<br>Danielle Fidler<br>Veronica Saltzman<br>Clean Air Task Force<br>114 State Street, 6th Floor<br>Boston, MA 02109<br>Phone: 202-285-0926<br>Email: dfidler@catf.us | Alexander Tom<br>Ada Statler<br>Earthjustice<br>180 Steuart Street, #194330<br>San Francisco, CA 94105<br>Phone: 415-217-2111<br>Email: atom@earthjustice.org |

*Counsel for Natural Resources Defense Council (additional counsel listed on the following pages)*

| | |
|---|---|
| Linnet Davis-Stermitz<br>Earthjustice<br>810 Third Avenue, Suite 610<br>Seattle, WA 98104<br>Phone: 206-343-7340<br>Email:<br>ldavisstermitz@earthjustice.org | Caroline Reiser<br>Natural Resources Defense Council<br>1152 15th Street NW, Suite 300<br>Washington, DC 20005<br>Phone: 202-717-8341<br>Email: creiser@nrdc.org |

*Counsel for Natural Resources Defense Council*

| | |
|---|---|
| William S. Scherman<br>Jeremy C. Marwell<br>Jeffrey M. Jakubiak<br>Vinson & Elkins LLP<br>2200 Pennsylvania Avenue, NW<br>Suite 500 West<br>Washington, DC 20037<br>Phone: 202-639-6507<br>Email: jmarwell@velaw.com | Garrett T. Meisman<br>845 Texas Avenue<br>Suite 4700<br>Houston, Texas 77002<br>Phone: 713-758-2559<br>Email: gmeisman@velaw.com |

*Counsel for Invenergy Solar Development North America LLC, Invenergy Thermal Development LLC, Invenergy Wind Development North America LLC, and Invenergy Transmission LLC*

| |
|---|
| Nicholas J. Guidi<br>Southern Environmental Law Center<br>122 C Street NW, Suite 325<br>Washington, DC 20001<br>Phone: 202-573-8136<br>Email: nguidi@selc.org |

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

Justin Vickers
Sierra Club
1229 W Glenlake Ave
Chicago, IL 60660
Phone: 224-420-0614
Email: justin.vickers@sierraclub.org

*Counsel for Sierra Club*

Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street, N.W., Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Dated: August 29, 2025

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF ISSUES ..........................................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................3

STATEMENT OF THE CASE.....................................................................8

STANDING..................................................................................................10

STANDARD OF REVIEW ..........................................................................19

ARGUMENT ...............................................................................................20

I.    The Design and Timing of FERC's Long-Term Planning Process Conflict with Its Own Findings and Fail to Fully Remedy the Excessive Costs and Inadequate Buildout from Current Planning Processes. .....................................20

    A.    It was arbitrary and capricious for FERC to allow Order 1000 processes to continue after finding those processes led to unjust and unreasonable rates. . ................................................................21

        1.    FERC's decision to retain Order 1000 processes was logically inconsistent with its findings that those processes led to unjust and unreasonable rates.........................................................22

        2.    FERC failed to offer a reasoned explanation for leaving deficient Order 1000 processes in place. ..................................................24

            a.    FERC offered no explanation to support its assertion that transitioning to an integrated transmission planning process would be too difficult.....................................................................25

            b.    FERC offered no explanation to support its assertion that Order 1000 planning would come to address only residual transmission needs. ................................................................27

            c.    FERC may not point to future compliance orders to excuse unreasoned decision-making in this Order. ...............................29

    B.    FERC erred in departing from its proposed three-year planning frequency and adopting a five-year cadence...................................31

i

II.     FERC Arbitrarily Authorized Transmission Planners to Exclude Key Factors That are Necessary to Ensure Just Rates and Reasonable Cost Allocation. ...................................................................................36

    A.     FERC arbitrarily allowed transmission providers to ignore high-voltage, direct current lines and other merchant transmission facilities when developing scenarios. ..................................................37

    B.     FERC's omission of energy storage from the alternative transmission technologies that planners must consider arbitrarily ignores its established use and substantial benefits. ...................................................45

    C.     FERC failed to rationally justify its decision to narrow the required benefits analysis, which will result in costly and inefficient transmission that fails to comply with bedrock utility law. ...........................................49

        1.     Substantial evidence supports mandating assessment of the four excluded benefits. ...................................................................50

            a.     Access to lower-cost generation ......................................51

            b.     Deferred generation capacity investments.......................53

            c.     Increased competition .....................................................54

            d.     Increased market liquidity ...............................................54

        2.     FERC arbitrarily allowed transmission providers to ignore these four benefits. ...................................................................55

III.     This Court Should Remedy the Specific Errors Addressed Herein, Without Undercutting Order 1920's Beneficial Improvements...........................57

CONCLUSION ......................................................................................60

STATEMENT REGARDING ORAL ARGUMENT ..............................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018)..........................................21, 23, 28, 35

*Ark. La. Gas Co. v. Hall*,
  453 U.S. 571 (1981)..........................................................58

*Belmont Mun. Light Dep't v. FERC*,
  38 F.4th 173 (D.C. Cir. 2022)...............................................59

*Bus. Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011)..............................................46

*Cleveland v. FERC*,
  773 F.2d 1368 (D.C. Cir. 1985)..............................................29

*Constellation Mystic Power, LLC v. FERC*,
  45 F.4th 1028 (D.C. Cir. 2022)..............................................27

*Ctr. for Food Safety v. Regan*,
  56 F.4th 648 (9th Cir. 2022)................................................58

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017)..........................................................11

*Defs. of Wildlife v. U.S. Dep't of the Interior*,
  931 F.3d 339 (4th Cir. 2019)................................23, 28, 35, 49

*Del. Div. of Pub. Advoc. v. FERC*,
  3 F.4th 461 (D.C. Cir. 2021)................................................58

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)............................................................30

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
  145 S. Ct. 2121 (2025)..........................................10, 14, 15, 16, 18

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)........................................................................................25

*Env't Action v. FERC*,
  996 F.2d 401 (D.C. Cir. 1993)......................................................................10

*Env't Def. Fund, Inc. v. EPA*,
  898 F.2d 183 (D.C. Cir. 1990)..................................................................58, 59

*Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*,
  106 F.4th 1113 (D.C. Cir. 2024)....................................................................23

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)........................................................................................20

*FDA v. R. J. Reynolds Vapor Co.*,
  145 S. Ct. 1984 (2025)....................................................................................19

*FERC v. Elec. Power Supply Ass'n*,
  577 U.S. 260 (2016)........................................................................................22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)........................................................................................59

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000)..........................................................................10, 14, 17

*Ill. Commerce Comm'n v. FERC*,
  576 F.3d 470 (7th Cir. 2009) ........................................................................50

*Kirk v. Comm'r of Soc. Sec. Admin.*,
  987 F.3d 314 (4th Cir. 2021) ........................................................................46

*Lancaster v. Sec'y of Navy*,
  109 F.4th 283 (4th Cir. 2024) .......................................................................57

*Leaf Tobacco Exporters Ass'n, Inc. v. Block*,
  749 F.2d 1106 (4th Cir. 1984) ..................................................................18, 19

*Manufactured Hous. Inst. v. EPA*,
  467 F.3d 391 (4th Cir. 2006) ........................................................................42

*Mayor of Baltimore v. Azar*,
   973 F.3d 258 (4th Cir. 2020) ...............................................................59

*Minyard Enters., Inc. v. Se. Chem. & Solvent Co.*,
   184 F.3d 373 (4th Cir. 1999) ...............................................................57

*Mobil Oil Corp. v. FPC*,
   417 U.S. 283 (1974)...............................................................................58

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.
   Ins. Co.*,
   463 U.S. 29 (1983)...............................................20, 21, 36, 43, 56

*N.C. Dep't of Env't Quality v. FERC*,
   3 F.4th 655 (4th Cir. 2021) ...............................................19, 20, 43

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
   746 F.3d 474 (D.C. Cir. 2014).............................................................58

*NRDC v. United States Forest Serv.*,
   421 F.3d 797 (9th Cir, 2005) ...............................................................36

*Ohio River Valley Env't Coal., Inc. v. Kempthorne*,
   473 F.3d 94 (4th Cir. 2006) .................................................................29

*Pye v. United States*,
   269 F.3d 459 (4th Cir. 2001) ...............................................................19

*Sierra Club v. DOI*,
   899 F.3d 260 (4th Cir. 2018) ...............................................................46

*Sierra Club v. W. Va. Dep't of Env't Prot.*,
   64 F.4th 487 (4th Cir. 2023) .........................................................35, 48

*St. Michaels Util. Comm'n v. Fed. Power Comm'n*,
   377 F.2d 912 (4th Cir. 1967) ...............................................................39

*Texas Ass'n of Mfrs. v. CPSC*,
   989 F.3d 368 (5th Cir. 2021) ...............................................................58

*Transmission Agency of N. Cal. v. FERC*,
   495 F.3d 663 (D.C. Cir. 2007)..............................................................19

*United States v. Curry*,
  965 F.3d 313 (4th Cir. 2020) ...............................................................40

*United States v. Texas*,
  599 U.S. 670 (2023)............................................................................18

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978)............................................................................29

*Westar Energy, Inc. v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007)..........................................................46

*Xcel Energy Servs. Inc. v. FERC*,
  815 F.3d 947 (D.C. Cir. 2016)............................................................19

*Zeneca, Inc. v. Shalala*,
  213 F.3d 161 (4th Cir. 2000) ..............................................................18

**Statutes**

5 U.S.C. § 706.....................................................................................19

16 U.S.C. § 824e ...............................................................................1, 22

16 U.S.C. § 824e(a).........................................................................19, 39

16 U.S.C. § 825*l*(a) ..............................................................................1

16 U.S.C. § 825*l*(b) ...........................................................1, 2, 19, 57

28 U.S.C. § 2112(a) ..............................................................................2

**FERC Orders**

*Allocation of Capacity on New Merch. Transmission Projects and
  New Cost-Based, Participant-Funded Transmission Projects*,
  142 FERC ¶ 61,038 (2013)................................................................38

*Notice of Denial of Rehearing by Operation of Law and Providing for
  Further Consideration*, 188 FERC ¶ 62,025 (2024) ...........................1

*Notice of Proposed Rulemaking*, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028 (2022) .......................................................................................................... 5, 14, 16, 27, 31, 32, 42, 45, 50, 51, 52, 53, 54, 55

Order 1920-A, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 189 FERC ¶ 61,126 (2024) ......................2, 9, 22, 23, 25, 26, 28, 29, 30, 34, 41, 42, 43, 44, 47, 48, 56

Order 1920, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (2024)............................................................................1, 8, 9, 10, 11, 12, 13, 14, 15, 16, 23, 25, 26, 27, 28, 30, 31, 32, 33, 35, 36, 37, 38, 39, 42, 44, 45, 46, 47, 48, 49, 50, 51, 55, 56, 57, 60

Order 890, *Preventing Undue Discrimination and Preference in Transmission Service*, 118 FERC ¶ 61,119 (2007) .............................................16

**Miscellaneous**

ACORE, Enabling Low-Cost Clean Energy and Reliable Service Through Better Transmission Benefits Analysis: A Case Study of MISO's Long Range Transmission Planning (Aug. 2022) ................................52

Johannes Pfeifenberger et al., The Brattle Group & Grid Strategies, Transmission Planning for the 21st Century: Proven Practices that Increase Value and Reduce Costs (Oct. 2021) .................... 12, 16, 52, 53, 54, 55

Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L. J. 209 (2024)...............................................42

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over these petitions for review of final orders issued by the Federal Energy Regulatory Commission ("FERC" or "Commission") under Federal Power Act section 313(b), 16 U.S.C. § 825*l*(b).  In addition, Petitioners meet Article III standing requirements, as detailed further in the Standing section below.

On May 13, 2024, FERC issued Order 1920, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (May 13, 2024) (R.813).  Order 1920 exercises FERC's authority under Federal Power Act section 206 to remedy unjust, unreasonable, or unduly discriminatory or preferential rates, 16 U.S.C. § 824e, by adopting reforms to FERC's regional transmission planning and cost allocation requirements, *see* R.813 Order 1920 P1.

Public Interest Organizations ("PIOs") and Invenergy (collectively, "Petitioners") filed timely rehearing requests on June 12, 2024.  *See* R.858 PIOs Rehearing Request; R.859 Invenergy Rehearing Request; 16 U.S.C. § 825*l*(a) (thirty-day deadline).  The requests were denied by operation of law after FERC failed to act within 30 days.  *See* R.899 *Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration*, 188 FERC ¶ 62,025 (July 15, 2024); 16 U.S.C. § 825*l*(a).

1

Within sixty days, Petitioners filed timely petitions for review in the D.C. Circuit and several other circuits where a "public utility to which [Order 1920] relates is located or has its principal place of business."  16 U.S.C. § 825*l*(b); *see Env't Def. Fund v. FERC*, No. 24-1659 (1st Cir. July 16, 2024); *Nat. Res. Def. Council v. FERC*, No. 24-1932 (2d Cir. July 17, 2024); *Appalachian Voices v. FERC*, No. 24-1650 (4th Cir. July 16, 2024); *Sierra Club v. FERC*, No. 24-4388 (9th Cir. July 17, 2024); *Invenergy Solar Dev. N. Am. LLC v. FERC*, No. 24-1255 (D.C. Cir. July 19, 2024).  After this Court was randomly selected for consolidation of petitions for review of Order 1920, petitions filed elsewhere were transferred here.  *See* Consolidation Order, MCP No. 190 (J.P.M.L. Aug. 8, 2024), ECF No. 5; Consolidation Order, *Appalachian Voices v. FERC,* No. 24-1650, ECF. No. 17 (4th Cir. Aug. 9, 2024); 28 U.S.C. § 2112(a)(3).

On November 21, 2024, FERC issued Order 1920-A, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 189 FERC ¶ 61,126 (Nov. 21, 2024) (R.976).  As relevant here, FERC addressed and rejected Petitioners' rehearing requests on the merits.  On January 21, 2025, Petitioners timely updated their petitions for review to include Order 1920-A.  *See Appalachian Voices v. FERC*, No. 24-1650 (4th Cir.), ECF Nos. 220 (Natural Resources Defense Council), 221 (Environmental Defense Fund), 222 (Sierra Club), 225 (Appalachian Voices et al.), 227 (Sierra Club);

2

*Invenergy Solar Dev. N. Am. LLC v. FERC*, No. 24-1756 (4th Cir.), ECF No. 133

(Invenergy).

## STATEMENT OF ISSUES

1. Whether FERC erred by failing to end or align the Order 1000 transmission planning process, notwithstanding FERC's own findings that that process causes unjust and unreasonable rates.

2. Whether FERC erred by requiring transmission planning cycles every five years, despite its findings and evidence supporting the three-year cadence it originally proposed.

3. Whether FERC erred by authorizing transmission planners to ignore or exclude important factors at key stages of the long-term planning process, specifically:

   (a) high-voltage, direct current ("HVDC") and other merchant transmission facilities from the long-term planning scenarios;

   (b) energy storage from the kinds of alternate technologies that planners must consider; and

   (c) key benefits from the list that transmission providers are required to evaluate.

## INTRODUCTION AND SUMMARY OF ARGUMENT

America's transmission system is broken. The regional electric grid that serves as the nation's economic backbone has been neglected over the last two decades by the incumbent transmission owners and operators charged with planning and building it. Overwhelming record evidence documents these problems. The existing regional grid has experienced catastrophic and deadly

3

failures during extreme weather events. It lacks the infrastructure necessary to adapt to acute changes to electricity supply and demand. And cheaper, cleaner resources wait years to connect to the grid while aging, uneconomic plants are unable to retire, costing consumers billions of dollars every year. As a result, our transmission system is completely unprepared to meet current—let alone future—needs.

None of this is new. Over the last several decades, FERC has issued iterative and increasingly specific transmission planning and cost allocation rules intended to ensure that the transmission system serves the public interest. These reform efforts have demonstrated that, where FERC mandates compliance with specific requirements, systemic improvements occur; but where FERC pairs a choose-your-own-compliance adventure with a generalized set of planning principles, nothing changes. This is unsurprising; incumbent transmission owners tasked with transmission planning and development have financial incentives to *avoid* the most cost-effective projects, since truly efficient regional transmission introduces competition and reduces profits for them and their affiliated generating resources.

In Order 1920, FERC determined that flaws in status quo transmission planning result in inefficient and costly investments, imposing unjust and unreasonable rates on consumers. FERC addressed these issues by establishing a

long-term regional transmission planning process to identify and build needed

transmission at reasonable rates.  Petitioners generally support FERC's framework

of reforms, including requiring transmission providers[1] to conduct scenario-based

analyses of transmission needs over at least a 20-year period, measure a mandatory

set of benefits to evaluate the full value of potential transmission projects, and

consider less expensive alternative transmission technologies as part of the project

evaluation and selection process.  Yet within each of these reforms, FERC omitted

requirements necessary to fully remedy the problems that it found.

FERC made several critical mistakes.  *First*, despite finding that existing

planning processes resulted in the building of inefficient and costly infrastructure,

FERC left these processes in place for the most common types of projects.  Failure

to address this error will allow providers to continue the very practices Order 1920

aimed to stop: building inefficient projects through a piecemeal, short-term process

when comprehensive, longer-term planning would be more cost-effective.

*Second*, FERC originally proposed requiring transmission providers to

conduct long-term planning every three years to ensure providers adapted to

---

[1] Petitioners use the terms "provider" and "planner" interchangeably in this brief to refer to a public utility that owns, controls, or operates transmission facilities, including when the transmission owner is separate from the transmission providers (as is the case in regional transmission organizations and independent system operators).  *See Notice of Proposed Rulemaking*, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028, P3 n.5 (Apr. 21, 2022) ("NOPR") (R.388).

changes in the energy sector with efficient, cost-effective solutions. Two years later, the case was even stronger. FERC acknowledged that the pace of demand growth, extreme weather events, and power generation supply trends had only increased. Yet the Final Rule lengthened the planning frequency to five years while still requiring providers to complete the planning steps within three years. This design unnecessarily slows the pace of comprehensive planning that FERC found necessary to efficiently address systemic needs, both now and for the future. And it incentivizes providers to revert to short-term, piecemeal transmission planning practices FERC found inadequate for addressing systemic needs.

*Third*, FERC allowed providers to ignore important substantive factors during the planning process. Order 1920 allows providers to ignore merchant HVDC lines when developing long-term planning scenarios. That allowance was arbitrary. Order 1920 requires providers to evaluate specific, enumerated factors in this process precisely because they inform whether more transmission is needed—or not. By authorizing providers to ignore high-capacity resources designed to solve multiple transmission needs, FERC arbitrarily green-lit them to approve duplicative or less efficient projects, chilling private investment, inviting undue discrimination by incumbent providers, and leading to excessive costs for consumers.

6

*Fourth*, FERC omitted energy storage from the alternative transmission technologies that providers must consider.  Here, too, the omission was arbitrary. Order 1920 required transmission providers to consider several low-cost alternative transmission technologies that can often address transmission needs more efficiently and cost effectively than traditional facilities.  FERC included that requirement for a good reason:  Precisely because these technologies would be less profitable to build, they will go unconsidered and undeveloped without such a requirement, leading to unjust and unreasonable rates for consumers paying the bill.  Energy storage is a particularly versatile and valuable technology, yet Order 1920 allows transmission providers to ignore it, despite substantial record support for mandating its consideration.

*Finally*, FERC unjustifiably narrowed the list of benefits that providers must evaluate when selecting transmission projects.  Because transmission providers are not properly assessing the benefits of potential projects, FERC proposed a specified set for them to evaluate.  Yet the Final Rule narrowed the list, allowing transmission providers to ignore four benefits: (1) access to lower-cost generation, (2) deferred generation capacity investments, (3) increased competition, and (4) increased market liquidity.  FERC's own evidence demonstrates that these four benefits are measurable, non-duplicative, and could result in *billions of dollars* of consumer savings.  Excluding these benefits would result in unjust and

7

unreasonable rates for consumers.  FERC moved the needle in the right direction by requiring the mandatory assessment of several known benefits.  But because it narrowed its list to exclude others, it failed to fully fix the problem, leaving consumers to face inflated rates that do not comply with fundamental cost allocation principles.

The Court should remand for FERC to address these errors, but craft a remedy that leaves intact Order 1920's planning process, to allow its critically-needed reforms to get underway while FERC corrects these shortcomings.

## STATEMENT OF THE CASE

To avoid repetition, pursuant to Federal Rule of Appellate Procedure 28(i), Petitioners adopt by reference the Statement of the Case in the Opening Brief of Petitioners Advanced Energy United, Electricity Transmission Competition Coalition, and LS Power Grid, LLC, which sets out the regulatory background and this proceeding's history.  In addition, Petitioners provide an overview of Order 1920's planning process, as relevant to their claims.

Order 1920 establishes a comprehensive, long-term transmission planning process designed to identify and address systemic needs with holistic solutions based on the full benefits of potential projects.  *See, e.g.*, R.813 Order 1920 PP90-100, 114, 224.  To start, Order 1920 requires transmission providers to forecast transmission needs over the next 20 years based on a minimum set of seven

8

"factors" that drive transmission demand, including economic conditions,
technological advancements, and political changes. R.813 Order 1920 PP284, 388.
Transmission providers use this forecast to develop three "reasonably probable"
scenarios of future supply and demand and identify the transmission needs for each
scenario. R.813 Order 1920 PP575-77. Providers then identify transmission
projects that could meet those needs, including alternatives that do not require
building new lines. R.813 Order 1920 PP916, 1198. Transmission providers
evaluate and decide whether to "select" these solutions based on their costs and a
minimum set of "benefits" that attempt to capture the full value a project would
provide. R.813 Order 1920 PP722-23, 916. Once selected, a separate process
begins to ensure transmission project costs are allocated roughly commensurate
with benefits. *See, e.g.,* R.976 Order 1920-A PP8-16. Transmission providers
must conduct this comprehensive, long-term planning at least every five years, but
complete the full cycle of steps outlined above within the first three years. R.813
Order 1920 PP377-79. Plaintiffs generally refer to this cumulative process as the
"Order 1920 process."

While Order 1920 establishes a new planning process, it does not eliminate
the old ones. FERC declined to require any changes to annual Order 1000
processes, which continue to separately consider reliability or economic needs over
a shorter timeframe. R.813 Order 1920 P241.

## STANDING

1.  PIOs are membership-based organizations that satisfy the test for associational standing.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000).

PIOs' members would "have standing to sue in their own right" because they meet Article III's requirements for injury-in-fact, causation, and redressability.  *Id.* at 180-81.  These members pay unnecessarily high electricity rates due to the gaps Order 1920 identified in FERC's prior regional transmission planning requirements.  And they will continue to pay excessive rates because while Order 1920 fixes some of these problems, it leaves key ones in place.  These "[m]onetary costs are of course an injury."  *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133 (2025) (citation omitted); *see also Env't Action v. FERC*, 996 F.2d 401, 406 (D.C. Cir. 1993) (organization's members injured by higher electricity costs).

As FERC documented, gaps in its regional planning requirements result in "customers footing the bill for piecemeal, inefficient, and less cost-effective transmission solutions" that address "short-term or small-scale transmission needs."  R.813 Order 1920 P100.  Left to their own devices, transmission providers use a "relatively near-term transmission planning horizon," which leads them to plan and build smaller, more expensive projects rather than identifying larger

10

regional projects that could meet the varied needs that emerge over a longer planning horizon. R.813 Order 1920 PP115-16. Even in these shorter-term planning processes, transmission providers ignore significant drivers of future needs, such as extreme weather, state laws, and new sources of demand (e.g., data centers). R.813 Order 1920 PP118-19. These processes also fail to "adequately consider the broader set of benefits" that regional projects could provide, leading to inefficient investments based on "an inaccurate portrayal of [different projects'] comparative benefits." R.813 Order 1920 PP122-23.

These planning failures drive up costs for consumers like PIOs[2] and their members.[3] While "even a small amount of money is ordinarily an 'injury,'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017), these costs are substantial. Consumers are captive ratepayers who must fund billions of dollars in transmission investments each year, with significant increases projected. *See, e.g.*, R.813 Order 1920 PP92-93 (estimating, among others, $16-26 billion in ISO-New England region alone from 2024-2050); R.813 Order 1920 P92 & n.201 (noting that increased transmission spending has made those costs "an increasing share of

---

[2] Like their members, PIOs also satisfy the test for standing directly by paying for electricity in their offices. *See* Alfred Decl. ¶¶ 6-10, 12-13; Attas Decl. ¶¶ 7-11; Shober Decl. ¶ 4; Wasson Decl. ¶ 4; Kim Decl. ¶¶ 25.

[3] *See, e.g.*, Bratton Decl. ¶¶ 6-7; Ramsey Decl. ¶¶ 5-6; Caffrey Decl. ¶¶ 4, 8; Arieff Decl. ¶ 8; Friedman Decl. ¶ 4; Freeman Decl. ¶ 5; Burrell Decl. ¶¶ 7-8; Williams Decl. ¶¶ 4-10; Carillon Decl. ¶¶ 6-9; Slack Decl. ¶¶ 5-7; Moore Decl. ¶¶ 4-5; Macfarlane Decl. ¶ 10; Wilson Decl. ¶¶ 8-9.

customers' overall electricity bills" in regions like ISO-New England); Freeman

Decl. ¶ 5 (ratepayer within ISO-New England). In the absence of an effective

regional transmission planning process, those investments are funneled into

inefficient, piecemeal transmission projects that cost consumers more and deliver

fewer benefits. *See, e.g.*, R.813 Order 1920 PP100-11. For example, transmission

providers in the ISO-New England region spent $2.5 billion on in-kind

replacement projects from 2016-2022, with another $3.1 billion in the works.

R.813 Order 1920 P109 *see also* R.131 PIOs ANOPR Comments, Exhibit A at 3

(in-kind replacement "misses opportunities" for larger projects that could also

"meet multiple other needs and provide additional benefits") (hereinafter "R.131

Brattle-Grid Strategies Oct. 2021 Report").

Although transmission spending has increased significantly, investment in

regional projects has not increased since Order 1000—and has even declined in

some regions. R.813 Order 1920 P101. In fact, some regional planning processes

have not produced a single regional project during that time. R.813 Order 1920

P101. That includes the Southeastern Regional Transmission Planning process,

which covers a region "fac[ing] the highest energy burden in the country" and

includes multiple monopoly utilities serving PIOs and their members. R.508

Southeast PIOs Initial Comments 1-2 n.3, 16; *see, e.g.*, Shober Decl. ¶ 15; Tait

Decl. ¶¶ 5, 9, 11; Abele Decl. ¶ 9; Allred Decl. ¶ 7; Wasson Decl. ¶ 9. These

planning failures force PIOs and their members to pay excessive costs for inefficient transmission investments.

These failures also result in an underdeveloped transmission system that inefficiently restricts energy flows within and across regions, thwarting competition and raising prices that PIOs and their members must pay for electricity. When regional transmission is non-existent or at capacity, it prevents lower-cost generators located outside constrained areas from transferring electricity to areas with more expensive generation. Consumers within those areas are essentially trapped by local generators who can use transmission congestion to their economic advantage. For instance, transmission congestion prevents "low-cost energy resources in upstate and western New York from reaching consumers downstate," costing those consumers $551 million in 2021 alone. Howe Decl. ¶ 15 (nationwide congestion costs of $13 billion nationwide in 2021); *see* U.S. Dep't of Energy Initial Comments 3 (finding congestion "persistent and . . . widespread in all regions of the country"); Arieff Decl. ¶¶ 5-8 (New York City ratepayer); Friedman Decl. ¶¶ 3-7 (same). Compounding this problem, a lack of spare transmission capacity keeps these prices high by impairing new, cheaper generation from even interconnecting to the grid to sell power. *See* R.813 Order

13

1920 PP104-09.[4]  Underdeveloped regional transmission also makes consumers

pay for unnecessary investments in generation to meet projected future needs—for

example, building a new large power plant—that could be avoided by instead

investing in less-expensive transmission capacity to import electricity from

neighboring regions.  *See, e.g.*, R.388 NOPR P 214.

These injuries are "fairly traceable" to FERC's action and would likely "be

redressed by a favorable decision" correcting FERC's errors.  *Laidlaw*, 528 U.S. at

180-81.  FERC's findings show how.  Order 1920's core premise is that

insufficiently "long-term, forward-looking, and comprehensive transmission

planning requirements" are "causing" planning failures and "relatively inefficient

[transmission] investments" to consumers' detriment.  R.813 Order 1920 P85.

FERC adopted Order 1920 to address these gaps, but it did not remedy all the

issues it identified.  That makes this the "familiar circumstance" where an agency's

"under-regulation" causes downstream economic injuries to consumers like PIOs

and their members.  *Diamond Alternative Energy*, 145 S. Ct. at 2136 (cleaned up).

---

[4] These planning failures thus harm the business activities of commercial entities developing new clean energy resources or seeking to purchase clean energy, including many of Petitioner North Carolina Sustainable Energy Association's members.  *See* Abele Decl. ¶¶ 10-11; Malkin-Weber Decl. ¶¶ 5-9.  That harm is traceable to FERC's errors in formulating Order 1920, and it will persist absent judicial relief.

PIOs and their members will continue to pay excessive rates because several aspects of Order 1920 fell short of solving the problems FERC sought to address. FERC recognized that shorter-term, siloed Order 1000 and local planning processes were not designed for a long-term, comprehensive assessment and thus result in inefficient and less cost-effective transmission investments. *See, e.g.*, R.813 Order 1920 PP101, 110. Yet it allowed them to persist. As explained below, FERC enabled transmission providers to continue channeling investments to these processes by declining to limit their use, *infra*, Section I.A., and reducing the frequency of Order 1920 planning, *infra*, Section I.B. Similarly, FERC mandated consideration of specific alternative transmission technologies because transmission providers otherwise "overlook or undervalue" such alternatives and "in turn, undertake relatively inefficient and less cost-effective investments." R.813 Order 1920 P1194. And FERC likewise found it "necessary" to require evaluation of specific project benefits because transmission providers were selecting "relatively inefficient and less cost-effective" projects without accurate cost-benefit analyses. R.813 Order 1920 PP722-23. But FERC refused to extend those requirements to a key alternative transmission technology or to four crucial benefits. *See infra*, Sections II.B., II.C.

PIOs' and their members' injuries are the "predictable" outcome of transmission providers' likely behavior without these requirements. *See Diamond*

15

*Alternative Energy*, 145 S. Ct. at 2136.  Under "commonsense economic principles," *id.,* self-interested transmission providers have strong incentives to minimize use of regional transmission planning processes.  Transmission owners earn lucrative, guaranteed rates of return on their transmission lines.  *See, e.g.*, R.131 PIOs ANOPR Comments 7-8.  Outside of the regional process—which opens projects up to competitive bidding—nothing stops transmission providers from selecting their own, relatively expensive projects and passing the bill on to consumers.  R.131 Brattle-Grid Strategies Oct. 2021 Report 20.  Moreover, as FERC has "long recognized," transmission providers benefit from an underdeveloped grid, which elevates prices for scarce transmission service and inhibits new generation from coming online to compete.  R.388 NOPR P32 (citing Order 890, 118 FERC ¶ 61,119, P57 (2007)); *accord* R.131 Brattle-Grid Strategies Oct. 2021 Report 22-23.

Order 1000's track record corroborates these commonsense economic inferences.  Left unchecked, these incentives will continue to result in a stark disparity between limited or nonexistent investments through the regional process and substantial increases in transmission spending elsewhere.  *See* R.813 Order 1920 PP92, 101, 109.  In short, FERC's own findings, economic principles, and past experience all demonstrate that PIOs and their members are likely to continue

16

paying excessive rates due to FERC's errors, absent a remand for FERC to fix them.

PIOs also satisfy the remaining requirements for associational standing. "[T]he interests at stake" are "germane" to PIOs' organizational purposes of promoting clean, affordable energy. *See Laidlaw*, 528 U.S. at 181; Allred Decl. ¶¶ 4-5; Paul Decl. ¶ 5; Stith Decl. ¶ 6; Fashho Decl. ¶ 4; Shober Decl. ¶ 3; Wasson Decl. ¶ 3; Tait Decl. ¶¶ 3, 17; Abele Decl. ¶¶ 5-6. Indeed, PIOs regularly participate as formal stakeholders in transmission planning processes to further those interests. *See, e.g.*, Abele Decl. ¶¶ 7-9; Howe Decl. ¶¶ 17-24; Shober Decl. ¶ 7; Tait Decl. ¶ 11. And neither the claims nor relief requested require their individual members' participation. *See Laidlaw*, 528 U.S. at 181.

2. As entities with a stake in a company currently engaged in developing a large, advanced-stage merchant HVDC transmission project, *see* R.859 Invenergy Rehearing Request 3-4, the Invenergy Petitioners suffer a concrete injury-in-fact from FERC's decision to authorize planners to exclude projects like Invenergy's from the scenario planning process. Without FERC mandating evaluation of merchant HVDC facilities in the scenarios, transmission providers are free to make and implement plans—including decisions about what transmission facilities to build—based on flawed assumptions about transmission needs that might otherwise be satisfied by merchant facilities that already exist or are in advanced

development stages.  Sane Decl. ¶¶ 8-10, 14 (Invenergy).  The result will be

incumbent transmission providers overbuilding their own transmission facilities,

impeding the development of, or drawing demand away from, competing merchant

HVDC facilities.  Sane Decl. ¶¶ 11-14; *see infra* pp.39-41; *Zeneca, Inc. v. Shalala*,

213 F.3d 161, 170 n.10 (4th Cir. 2000); *Leaf Tobacco Exporters Ass'n, Inc. v.

Block*, 749 F.2d 1106, 1112 (4th Cir. 1984).  The resulting pocketbook injury to

Invenergy also includes increased monetary costs and delays in the development of

Invenergy's project.  Sane Decl. ¶¶ 11-14; *see United States v. Texas*, 599 U.S. 670,

676 (2023).  Incumbent utilities' development of excess transmission infrastructure

could also weaken the "business case" for Invenergy's upcoming projects, making

it more difficult for Invenergy to obtain investment.  Sane Decl. ¶¶ 11, 14.

The exclusion of merchant transmission facilities from mandatory

consideration also harms the Invenergy Petitioners involved in power *generation*

projects.  Sane Decl. ¶ 15.  By impeding the development of merchant transmission

facilities, FERC's decision constrains these entities' ability to sell power into

adjacent regions.  Sane Decl. ¶ 15.

These injuries are traceable to FERC's orders here, which authorize

transmission providers to exclude projects like Invenergy's from the initial

scenarios, thereby creating the risk that excess transmission facilities will be built.

*See infra* pp.39-41; *Diamond Alternative Energy*, 145 S. Ct. at 2136

18

("commonsense economic realities" and "predictable" "third party behavior" mean that under-regulation of a business "may cause downstream ... economic injuries to others in the chain" (cleaned up)).

Invenergy's harms would be remedied by a decision remanding for FERC to address its legal errors, including to consider whether to require transmission planners to include merchant facilities like Invenergy's in the process of developing scenarios. *See Leaf Tobacco Exporters Ass'n*, 749 F.2d at 1112; *Pye v. United States*, 269 F.3d 459, 471 (4th Cir. 2001).[5]

## STANDARD OF REVIEW

The Court reviews Petitioners' challenges under the "arbitrary and capricious" and "substantial evidence" standards of review. *See N.C. Dep't of Env't Quality v. FERC*, 3 F.4th 655, 671 (4th Cir. 2021) (citing 5 U.S.C. § 706; 16 U.S.C. § 825*l*(b)). The arbitrary and capricious standard requires that FERC orders

---

[5] Petitioners' interests—as consumers paying excessive rates and entities facing obstacles to transmission and generation development—also satisfy the non-jurisdictional zone-of-interests test for parties "aggrieved" by FERC orders. 16 U.S.C. § 825*l*(b). Petitioners more than "arguably" fall "within the interests that the [Federal Power Act] sought to protect." *FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1992 (2025). The Act prohibits "unjust, unreasonable, unduly discriminatory or preferential" rates, 16 U.S.C. § 824e(a), with the "primary aim" of "protect[ing] consumers from excessive rates and charges." *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016) (citation omitted); *see also Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 670 (D.C. Cir. 2007) ("no trouble finding" that entity seeking to become participating transmission owner within regional organization fell within zone of interests).

"be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592

U.S. 414, 423 (2021). FERC must "examine the relevant data and articulate a

satisfactory explanation for its action," including "a rational connection between

the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.

State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). FERC may

not, among other things, ignore "an important aspect of the problem" or provide

"an explanation for its decision that runs counter to the evidence before the

agency." *Id.*

FERC must also support its findings with substantial evidence, meaning

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *N.C. Dep't of Env't Quality*, 3 F.4th at 671 (cleaned up). To make

this determination, the Court conducts "an objective assessment of the sufficiency

of the evidence" based on "the whole record," including "whatever in the record

fairly detracts from the agency's factual findings." *Id.* (cleaned up).

**ARGUMENT**

**I.  The Design and Timing of FERC's Long-Term Planning Process
     Conflict with Its Own Findings and Fail to Fully Remedy the Excessive
     Costs and Inadequate Buildout from Current Planning Processes.**

FERC erred by stopping short of remedying all the problems that it found.

Despite finding that comprehensive, long-term planning was necessary because

existing processes result in ineffective and inefficient transmission build-out,

20

FERC allowed those same processes to persist.  Moreover, FERC only required the Order 1920 process to occur every five years, hampering its ability to address the substantial and rapidly changing transmission needs the rule was designed to address.  FERC thus channeled more planning into existing processes that it found were particularly ill-suited to these circumstances.  These counterintuitive decisions lacked reasoned explanation.

### A. It was arbitrary and capricious for FERC to allow Order 1000  processes to continue after finding those processes led to unjust and unreasonable rates.

The core premise of Order 1920 was that Order 1000 processes led to unjust and unreasonable rates.  Yet FERC opted to allow those processes to remain in place anyway—and it offered no reasoned explanation for this choice.  Agencies must articulate a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (citation omitted), and they cannot draw conclusions that are "inconsistent with most of [their] analysis" on the very same point, *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).  Because FERC's logic was internally inconsistent and lacked reasoned explanation, it was arbitrary and capricious.

21

**1. FERC's decision to retain Order 1000 processes was logically inconsistent with its findings that those processes led to unjust and unreasonable rates.**

Section 206 of the Federal Power Act involves two steps:  if at step one FERC finds a rate to be unjust and unreasonable, at step two FERC must fix a just and reasonable rate in its place. 16 U.S.C. § 824e; *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016).  In Order 1920, at step one, FERC found that Order 1000 processes produce unjust and unreasonable rates.  Yet, at step two, FERC nonetheless permitted those planning processes to remain in place.  Allowing the continuation of the very process that FERC concluded produced unjust and unreasonable rates was arbitrary and capricious.

Order 1920's central finding is that the transmission planning processes required by Order 1000 do not produce just and reasonable rates.  FERC identified three deficiencies in Order 1000 processes.  *First*, they lack "a sufficiently long-term assessment of transmission needs" to take advantage of the "efficiencies or economies of scale" promised by regional transmission facilities.  R.976 Order 1920-A P75.  *Second*, they do not require transmission providers to "account adequately" for "known and identifiable" determinants of long-term transmission needs, such as extreme weather or demand growth.  R.976 Order 1920-A P76 (citations omitted).  *Third*, they often ignore the multiple benefits that transmission solutions provide, including accessing lower-cost power and lowering the risk of

blackouts. *See* R.976 Order 1920-A PP76-77; R.813 Order 1920 PP116-17, 1103. These deficiencies cause "siloed" and "piecemeal" decision-making. Transmission providers prioritize near-term needs without adequately assessing future demand growth, supply changes, and other economic drivers, with ratepayers paying the price for "inefficient investments." *See* R.813 Order 1920 PP85, 101, 122-23, 127-28, 1474. FERC thus had little trouble concluding that these deficiencies rendered Order 1000 planning processes unjust and unreasonable. R.813 Order 1920 P85.

Yet FERC inexplicably left those processes in place. *See* R.813 Order 1920 P241. Indeed, FERC declined to impose any measure that prevents transmission providers from continuing to use their Order 1000 processes to engage in the very practice Order 1920 was predicated on stopping: building inefficient projects through a piecemeal process when comprehensive, longer-term planning would be more cost-effective. R.813 Order 1920 P241; *see* R.976 Order 1920-A PP214-17.

By issuing a rule that contradicted its own findings, and thus was "illogical on its own terms," FERC acted arbitrarily and capriciously. *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1118 (D.C. Cir. 2024) (citation omitted); *see also, e.g.*, *ANR Storage*, 904 F.3d at 1028 ("internally inconsistent" decisions are "arbitrary and capricious"); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 352-53 (4th Cir. 2019) (similar).

## 2. FERC failed to offer a reasoned explanation for leaving deficient Order 1000 processes in place.

That decision was especially arbitrary because FERC offered no reasoned explanation for its approach.  It had good options for preventing or limiting the continued use of Order 1000 planning from producing unjust and unreasonable rates.  PIOs suggested three.  Preferably, FERC could have required each transmission provider to file a single, integrated planning process that meets its obligations under *both* Order 1000 and Order 1920.  R.559 PIOs Initial Comments 45-46; R.858 PIOs Rehearing Request 21.  Failing that, FERC could have limited the continued use of Order 1000 processes to "urgent transmission needs that could not have been reasonably anticipated" or addressed within a current long-term planning cycle.  R.858 PIOs Rehearing Request 20 (providing example of "sudden transmission failure that could not have been planned for").  Or, at the very least, FERC could have required transmission providers to use the same "base case" for planning under both Order 1000 and Order 1920 processes.  The "base case" is the planner's assessment of the most likely future conditions and the assumption upon which decision-making is based.  Because Order 1000 base cases fail to identify the full range of future needs and generate inefficient transmission solutions, aligning the Order 1000 base case assumptions with the more comprehensive scenarios generated under Order 1920 would have reduced conflict between the two processes.  R.858 PIOs Rehearing Request 24-25.

24

FERC rejected these suggestions.  Instead, FERC offered a series of disjointed responses that either claim that solving this problem would be too difficult or downplay the possibility that Order 1000 processes will continue to function as inefficiently as they have in the past.  R.813 Order 1920 PP244-45; R.976 Order 1920-A PP214-17.  None of FERC's objections supplies a reasoned explanation for its failure to resolve the inconsistency between its finding that Order 1000 planning produced unjust and unreasonable rates and allowing it to continue unchanged.

### a. FERC offered no explanation to support its assertion that transitioning to an integrated transmission planning process would be too difficult.

FERC's claim that the benefits of requiring a single, integrated planning process "may be outweighed by the difficulty of transitioning to such a process," R.813 Order 1920 P245; *accord* R.976 Order 1920-A P214, lacks even the "minimal level of analysis" needed to withstand arbitrary and capricious review. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  FERC did not explain what it meant by the "difficulty of transitioning" to a combined process, nor why that difficulty outweighs the value of preventing transmission providers from continuing to use a process that produces unjust and unreasonable rates.

If the "difficulty" FERC contemplated is the difficulty transmission providers might have developing tariff provisions for a combined process, FERC failed to explain any incremental burden.  Order 1920-A already requires that

transmission providers create an entirely new planning process and provided a multi-year compliance process to fulfill its requirements.  R.976 Order 1920-A PP507, 914-15.  And, in Order 1920, FERC required transmission providers to "address the possible interaction between the transmission planning cycle for Long-Term Regional Transmission Planning and existing Order 1000 regional transmission planning processes" in their compliance filings.  R. 813 Order 1920 P1071.  Thus, having required a restructuring of transmission planning, along with a directive to address the interaction between the Order 1000 and Order 1920 processes, it is unclear what additional burden would come from a directive to combine the two processes.  If anything, leaving questions about the relationship between the processes unresolved and forcing transmission providers to guess at what terms FERC will accept poses the greater difficulty.

If instead FERC meant the difficulty of *administering* a combined process, it also failed to offer any reasoning.  As PIOs observed, administering a combined process would seem less burdensome than "running two entirely different planning processes, one of which [FERC] already found to be unjust and unreasonable."  R.858 PIOs Rehearing Request 21.

**b. FERC offered no explanation to support its assertion that Order 1000 planning would come to address only residual transmission needs.**

FERC's optimistic speculation that the Order 1920 process's longer time horizon and broader consideration of benefits would leave existing Order 1000 processes "to address only residual needs" fares no better.  R.813 Order 1920 P245.

FERC offered no credible basis to expect that outcome.  PIOs offered FERC reasons why Order 1000 planning will continue to produce inefficient investments absent clear rules to prevent it.  R.858 PIOs Rehearing Request 16-25; *see also Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1055 (D.C. Cir. 2022) (faulting FERC's failure to respond meaningfully to party's objections and reliance on apparent contradictions regarding a dispositive issue).

*First*, so long as Order 1000 processes remain available, some transmission providers will seek advantages from them.  For example, Order 1000 permits utilities to build certain "reliability" projects on a non-competitive basis.  R.388 NOPR P339.  And they have eagerly taken advantage of that option.  As FERC found, recent transmission investment has been "concentrated" in projects that are exempt from competition.  R.388 NOPR P344.  Retaining Order 1000 processes preserves that incentive—indeed, it even enhances it, because long-term transmission planning may reduce the need for such projects.  R.858 PIOs

27

Rehearing Request 19-20. *Second*, the timing of the two processes is not aligned in a way that limits Order 1000 processes to "residual" needs. FERC refused to require transmission providers to sync the timing of their Order 1920 and Order 1000 processes. R.976 Order 1920-A P216. In fact, it extended the frequency of long-term planning cycles from three to five years—thereby expanding transmission providers' opportunities to select inefficient investments through Order 1000 processes. *See infra* Section I.B.

FERC's related assertion that Order 1920's "Long-Term Regional Transmission Planning and cost allocation requirements adequately remedy" the deficiencies of Order 1000 processes is similarly unavailing. R.976 Order 1920-A P215. FERC apparently meant that because Order 1920 requires transmission providers to create a long-term planning process that lacks the deficiencies of Order 1000, it is irrelevant whether transmission providers continue to use Order 1000 processes as well. But this conclusion flatly contradicts the rest of Order 1920 and is therefore arbitrary and capricious. *See ANR Storage*, 904 F.3d at 1028; *Defs. of Wildlife*, 931 F.3d at 352-55. The purpose of Order 1920 was not simply to require transmission providers to make transmission investments based on long-term planning, but also to require them to avoid or minimize inefficient investments based on short-term planning. R.813 Order 1920 P100. FERC's suggestion that it could somehow remedy the deficiencies of the existing process,

28

while leaving transmission providers free to use that process to make inefficient

investment decisions, is unreasoned and thus arbitrary and capricious.  *See Ohio*

*River Valley Env't Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006).

### c. FERC may not point to future compliance orders to excuse unreasoned decision-making in this Order.

Finally, FERC claims that requiring alignment between Order 1000 and Order

1920 processes is "premature," pointing to its ability to evaluate the interaction in

transmission providers' compliance filings.  *See* R.976 Order 1920-A P216.  That

bare assertion does not satisfy FERC's obligation to reasonably explain its decision

and respond to the specific concerns regarding misalignment that PIOs detailed.

*See, e.g.*, R.858 PIOs Rehearing Request 22-24 (highlighting potential for Order

1000 projects to "repeatedly disrupt[]" Order 1920 planning assumptions and for

"inconsistent assumptions and uncoordinated project identification").  While FERC

has broad discretion to control its decision-making process, *see Vt. Yankee Nuclear*

*Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 543 (1978), and to defer

issues to compliance proceedings, *see Cleveland v. FERC*, 773 F.2d 1368, 1375

(D.C. Cir. 1985), it may not promulgate a rule that is incoherent on its face and

point to future compliance proceedings in the hope they resolve the incoherence.

"It is a foundational principle of administrative law that judicial review of agency

action is limited to the grounds that the agency invoked when it took the action."

29

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020)

(cleaned up).  This rule, which applies both to post-hoc rationalizations of counsel

and of the agency itself, frees courts and litigants from having to "chase a moving

target."  *Id*. at 23.  Yet that is precisely what would occur were FERC permitted to

gesture at the compliance process to brush aside significant concerns regarding a

fundamentally incoherent aspect of its order.

That is particularly true where, as here, FERC provided no clear principle

for how, on compliance, it will "evaluate the interaction between these processes . .

. and address any potential issues."  R.976 Order 1920-A P216.  FERC stated that

Order 1920 would prevail in case of conflict between the two rules.  R.813 Order

1920 P244.  But this statement is of no help when FERC has not said what it would

mean for the continued use of Order 1000 processes to conflict with Order 1920.

After all, FERC stated in Order 1920 that it would "not require that any

transmission provider replace or otherwise make changes to its existing Order

1000-compliant regional transmission planning processes."  R.813 Order 1920

P241.  With that statement, what basis could there be to conclude that an existing

Order 1000 process conflicts with Order 1920?  Absent clear principles to be

applied on compliance, FERC cannot reasonably rely on that process to resolve the

incoherence between what it has required in Order 1920 and the Order 1000

processes it left in place.

### B. FERC erred in departing from its proposed three-year planning frequency and adopting a five-year cadence.

When FERC set out to establish a required frequency for long-term planning, three years was the obvious choice. FERC found that rapid changes in the energy sector required nimble planning processes. And FERC determined—both in the NOPR and the Final Rule—that three years provided "sufficient time for transmission providers" to complete the required steps. R.813 Order 1920, P379; *see also* R.388 NOPR P99. Despite this finding and widespread support for three-year cycles,[6] the Final Rule unveiled a half-measure that no one requested: it required providers to undertake long-term planning once every *five* years, while nevertheless requiring completion of the planning cycle within the first three years. R.813 Order 1920 P379. That design unnecessarily slows the pace of long-term planning, running contrary to Order 1920's purpose.

As FERC explained, critical investments in regional transmission solutions are needed now and in the future for an "already oversubscribed transmission system" facing multiple growing demands. R.813 Order 1920 PP94-95. The generation fleet is changing rapidly, with increasing resource capacity waiting in interconnection queues. R.388 NOPR P45; R.813 Order 1920 PP96-99 & n.242.

---

[6] *See* R813 Order 1920 P354-60; R.858 PIOs Rehearing Request 11-12 n.43.

Electrification and "new large loads associated with evolving industrial and commercial needs" are boosting demand, while antiquated resource retirements and increasingly extreme weather impact supply are forcing rapid system evolution to maintain grid reliability.  R.388 NOPR P45; R.813 Order 1920 PP94.

This pace of change is only increasing.  Estimates predict accelerating growth from data centers.  R.813 Order 1920 P95 nn.214-21.  Extreme weather events are occurring with greater frequency, with three catastrophic post-NOPR winter storms demonstrating the urgent importance of regional transmission to ensuring system reliability.  *See* R.813 Order 1920 PP94, 234 n.585; R.858 PIOs Rehearing Request 10.

These dynamic changes led FERC to conclude a few things.  The billions of dollars already spent by ratepayers annually on transmission was "likely to substantially increase" to meet this "growing need for new transmission infrastructure."  R.813 Order 1920, PP93-94.  The magnitude of investment needed made comprehensive, long-term planning "essential" to ensure that "customers' money is well-spent" on efficient and cost-effective projects, rather than the piecemeal development of the status quo. R.813 Order 1920 P100.  And the pace of change means new needs emerge quickly, heightening the importance of proactively identifying them and developing efficient solutions "well in advance of these issues affecting the transmission system." R.813 Order 1920 PP90, 94, 228.

32

As FERC saw it, status quo processes are particularly ill-suited for addressing these needs efficiently, because they do not identify long-term needs or assess the holistic benefits of projects that could address multiple needs over various time horizons. R.813 Order 1920 P116. The likelihood that near-term assessments "will fail to identify Long-Term Transmission Needs and more efficient or cost-effective regional transmission facilities to meet those needs is *higher during periods of rapid change*"—like those "the electric sector is now experiencing." R.813 Order 1920 P117 (emphasis added).

Logically, that reasoning called for decisive action to decrease reliance on near-term processes. Instead, Order 1920 did the opposite. By requiring that long-term planning occur only every five years, R.813 Order 1920 P377, FERC *increased* dependence on existing processes and limited the ability of long-term planning to address periods of turbulent change.

That is because a provider will conduct *five* annual Order 1000 planning cycles in parallel with one Order 1920 cycle. As conditions change during that cycle and new transmission needs emerge—as FERC has found they will—near-term planning cycles will be providers' preferred recourse. In that case, providers can select less efficient solutions that meet singular needs. If, by contrast, transmission providers were required to update their long-term outlooks and expansion plans as frequently as FERC determined was feasible, those processes

33

would capture emerging needs and develop more efficient solutions that address needs in *both* the short and long terms.

For example, if three years into a long-term planning cycle, a utility's demand forecast spikes due to a new state or federal energy policy or unexpected data center development, the annual Order 1000 planning process will treat the resulting transmission need as a reliability need and identify a solution to meet that individual need. At the same time, new generation units seeking to meet data center demand may request interconnection to the grid, while others retire, creating transmission needs of their own. Yet the limited focus of the Order 1000 reliability processes will ignore the relationship between these and other needs, relying on separate interconnection processes to build piecemeal grid upgrades instead of using Order 1920 planning to solve both immediate and anticipated longer-term needs more efficiently and cost-effectively.

In dismissing these concerns, FERC relied on a flawed premise that providers could, if they wanted, incorporate emerging needs into the Order 1920 process later by "updating the assumptions, inputs, and factors used to inform Long-Term Scenarios" during those five years. R.976 Order 1920-A P257.

That reasoning is doubly flawed. First, FERC did not explain how, exactly, providers would surmount the practical difficulties of updating those scenarios and reopening the planning analysis. Updating inputs and assumptions is the *first step*

34

of building scenarios—a process that can take over a year.  R.813 Order 1920 P353.  Planners then use those scenarios to identify transmission needs, use those needs to identify potential project solutions and measure their benefits, and use those benefits to select projects.  R.813 Order 1920 P379.  FERC's assumed fix effectively restarts the planning process at square one.  *See* R.519 NYISO Comments 19.

Second, FERC's speculation that providers would go out of their way to address emerging needs through the Order 1920 process flies in the face of Order 1920's rationale.  Order 1920 is built on FERC's recognition that providers do not engage in long-term, comprehensive planning unless required to do so.  *See, e.g.*, R.813 Order 1920 PP118-19, 238, 723, 1195; *see also supra* Section I.A.  FERC "failed to provide a reasoned explanation" why this "past [behavior] will not continue to occur going forward."  *See Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 501 (4th Cir. 2023).  By allowing providers to use the very planning processes it sought to displace without a rational justification, FERC acted contrary to both its goals and its findings.  That was arbitrary and capricious.  *See ANR Storage*, 904 F.3d at 1028; *Defs. of Wildlife*, 931 F.3d at 352-53.

Finally, FERC attempted to justify the switch to five years by claiming to "balanc[e]" the benefits of requiring cycles every three years against the "administrative burdens" of doing so.  R.813 Order 1920 P379.  But as explained

35

above, FERC both underestimated the benefits of a three-year planning cycle and further minimized them by erroneously assuming that transmission providers could—and would—address emerging needs by incorporating them mid-cycle into the Order 1920 process. *See NRDC v. United States Forest Serv.*, 421 F.3d 797, 816 (9th Cir, 2005) (agency's "error in assessing market demand fatally infected its balance of economic and environmental considerations, rendering [its action] arbitrary and capricious in violation of the APA."). On the other side of its balancing, FERC did not actually find that the planning process was too burdensome to complete in three years; it found that "three years provides sufficient time" to complete the entire process. R.813, Order 1920 P379. FERC thus "offered an explanation for its decision that runs counter to the evidence before the agency," rendering it arbitrary and capricious. *State Farm*, 463 U.S. at 43.

## II. FERC Arbitrarily Authorized Transmission Planners to Exclude Key Factors That are Necessary to Ensure Just Rates and Reasonable Cost Allocation.

Order 1920 also fell short of FERC's goals by authorizing transmission providers to ignore important factors in the long-term planning process. Specifically, FERC invited them to artificially exclude advanced-stage merchant transmission projects in developing the long-term scenarios that form the basis for the entire planning process. FERC also allowed planners to overlook key means of

36

satisfying the transmission needs identified in those scenarios.  And FERC

improperly narrowed the range of benefits that planners must consider in

evaluating potential transmission projects.

### A. FERC arbitrarily allowed transmission providers to ignore high-voltage, direct current lines and other merchant transmission facilities when developing scenarios.

Order 1920 requires that transmission planners develop three future

scenarios to serve as a cornerstone for the transmission planning process.  R.813

Order 1920 P559.  These scenarios must be based on the best available inputs

about "the future electric power system" over a twenty-year horizon and be used to

identify long-term transmission needs.  The scenarios are thus essential to

identifying and evaluating potential facilities to meet those needs.  R.813 Order

1920 PP40, 344.

Order 1920 correctly requires planners to consider a range of enumerated

factors when developing these scenarios.  R.813 Order 1920 P409.  As FERC

explained, it was appropriate to require planners to consider those factors because

each is "essential to identifying Long-Term Transmission Needs," and failing to

incorporate those factors "would increase the likelihood" that transmission will

"underestimate—or omit entirely—…known determinants" of such needs.  R.813

Order 1920 PP410-11.  FERC determined that it must *require* (rather than simply

recommend) that planners consider these factors because transmission providers had previously "ignore[d]" them.  R.813 Order 1920 PP118-19.

Despite acknowledging this track record, FERC arbitrarily declined to mandate, and thus invited transmission planners to ignore, consideration of a key factor—merchant HVDC transmission facilities.  R.813 Order 1920 P493.  This aspect of the orders will likely lead to transmission plans that needlessly increase consumer costs and distort the selection of projects for ultimate construction.

Invenergy urged FERC to include merchant HVDC transmission facilities that are at an advanced stage of development among the factors that transmission planners must consider when formulating scenarios.  R.859 Invenergy Rehearing Request 2.  Merchant facilities are funded by private investors who assume the market risk of development, rather than through the traditional utility process in which risk is underwritten by captive retail ratepayers.  R.859 Invenergy Rehearing Request 2 n.4; *Allocation of Capacity on New Merch. Transmission Projects and New Cost-Based, Participant-Funded Transmission Projects*, 142 FERC ¶ 61,038, P2 (2013).  Merchant transmission facilities create beneficial market competition, bring private investment to a sector with enormous capital needs, and promote efficiency by offering additional means of transporting electricity toward end users.

HVDC lines carry electricity over long distances using direct current (as opposed to the alternating current predominantly used in the U.S. grid).  These

facilities offer distinct benefits that can make them superior, in certain respects, to traditional lines using alternating current. These advantages include the ability to connect transmission systems that operate at different frequencies, greater efficiency over long distances, greater and more flexible connectivity between regional grids, quicker development timeframes, enhanced control over power flows, and improved grid reliability. R.859 Invenergy Rehearing Request 11-13; R.483 Invenergy Initial Comments 21-22; R.764 Policy Integrity Supplemental Rulemaking Comment, App. A 25; *see generally* Andre Pereira, U.S. Dep't of Energy, *Connecting the Country with HVDC* (Sept. 27, 2023), https://perma.cc/N26A-28ZD.

Accounting for the existence of advanced-stage merchant transmission infrastructure, particularly HVDC facilities, is essential to an accurate understanding of the future electric power system, and thus to an accurate, comprehensive transmission planning process. R.859 Invenergy Rehearing Request 3-4, 8; *see* R.813 Order 1920 P40. A long-term transmission plan that ignores such facilities will most likely lead to unnecessary and inefficient overbuilding, leading to undue discrimination against merchant developers, and causing unjust and unreasonable rates for ratepayers. *Cf.* 16 U.S.C. § 824e(a); *St. Michaels Util. Comm'n v. Fed. Power Comm'n*, 377 F.2d 912, 915 (4th Cir. 1967).

That is because a plan developed without considering merchant transmission would naturally have to include *other* facilities to address needs the merchant facilities could meet.  R.859 Invenergy Rehearing Request 3-4.  That would allow traditional utility transmission providers to charge captive ratepayers for duplicative new projects.  The prospect of such projects (developed with the tailwinds of assured ratepayer funding) might chill the development of competing merchant lines.  *See* R.859 Invenergy Rehearing Request 3-4.  A planning process that relies on incomplete data *inputs* cannot be expected to generate non-arbitrary *outputs*.  *Cf. United States v. Curry*, 965 F.3d 313, 345 (4th Cir. 2020) (en banc) (Thacker, J., concurring) ("Any . . . algorithm is only as good as the data that goes into it.").  Here, that process will encourage inefficient projects while discouraging projects that foster beneficial competition.

To take one concrete example, the long-range transmission planning initiative recently conducted by the Midcontinent Independent System Operator, Inc. ("MISO") ignored outright an 800-mile merchant HVDC transmission line that is being developed by Invenergy's affiliate, Grain Belt Express LLC.  R.859 Invenergy Rehearing Request 3-4; R.483 Invenergy Initial Comments 5-7.  That planning process resulted in MISO approving billions of dollars of new transmission projects, selected without considering potential benefits from

40

Invenergy's project.[7]  Unless transmission providers are required to account for merchant HVDC, similar omissions are likely to continue.

Invenergy's experience demonstrates that it is not enough for FERC merely to *allow* transmission planners to consider merchant HVDC facilities.  *See* R.976 Order 1920-A P331 (clarifying that planners "may incorporate additional categories of factors" into scenarios).  History, logic, and an extensive record demonstrate that planners will give outsized weight to traditional, incumbent transmission facilities while downplaying or excluding merchant facilities.

Multiple parties underscored these problems during the agency proceedings.  *See* R.859 Invenergy Rehearing Request 4-10; R.658 AEE Reply Comments 18-19; R.358 SOO Green ANOPR Reply Comments 4.  As explained in those submissions, merchant developers have historically "face[d] barriers" to participation in the transmission market, given incumbent utilities' strong incentives to plan and build their own transmission and collect guaranteed, ratepayer-funded returns.  R.358 SOO Green ANOPR Reply Comments 4.  If given flexibility, planners will inevitably structure scenarios in "too narrow" a way that overlooks merchant technologies that can "provide more cost effective or efficient solutions."  R.658 AEE Reply Comments 18-19.  After all, incumbent utilities

---

[7] *See generally* MISO, *MISO Board Approves $10.3B in Transmission Projects* (July 25, 2022), https://tinyurl.com/ycvzbtkv .

typically "earn a return on capital investments," so "their profits increase when they spend more" on their own infrastructure.[8]  Requiring planners to *at least consider* merchant transmission assets is thus a necessary check against utilities' natural incentive to favor their own facilities.

FERC disregarded these concerns, authorizing transmission planners to ignore merchant HVDC facilities when developing scenarios.  R.813 Order 1920 PP409, 493; R.976 Order 1920-A  PP329-34.  As its primary justification for that decision, FERC said merchant HVDC facilities are a means of "*address[ing]*" transmission needs but are not essential for "*identifying*" such needs.[9]  R.976 Order 1920-A P331 (emphasis added).  This distinction does not withstand scrutiny.

Any rational process of anticipating future transmission needs obviously depends on understanding *both* (1) demand for transmission service over time and

---

[8] Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L. J. 209, 221 (2024).

[9] FERC also mentioned that it had "not propose[d] specific requirements in the NOPR regarding merchant HVDC transmission facilities under development." R.813 Order 1920 P493.  To the extent FERC meant to suggest that it was procedurally barred from requiring consideration of merchant HVDC, any such concern was unwarranted.  The NOPR invited comments regarding "whether and how" the proposed categories "adequately capture factors expected to drive changes in the resource mix and demand."  R.388 NOPR P112.  By "ask[ing] for comments on" its proposed factors, FERC provided notice that factors might evolve, and opportunity for comment.  *See Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 399-400 (4th Cir. 2006).

(2) the supply of transmission facilities that will exist to fulfill that demand. Looking only to *demand* without considering the *supply* of transmission facilities will overestimate long-term need for new transmission projects.[10] FERC offered no reasoned explanation for the wrongheaded notion that a meaningful assessment of transmission needs can occur without an accurate understanding of the expected baseline of transmission assets. *See State Farm*, 463 U.S. at 43.

FERC offered conclusory justifications when dismissing Invenergy's concerns, falling short of its obligation of reasoned decisionmaking. For example, FERC said that it was "unpersuaded" by record evidence that allowing planners to ignore merchant HVDC would result in undue discrimination against non-incumbent developers. R.976 Order 1920-A PP333-34. But it never adequately explained *why*, beyond a bare *ipse dixit*, it found the abundant record evidence unpersuasive. *See State Farm*, 463 U.S. at 43; *see also N.C. Dep't of Env't Quality*, 3 F.4th at 672 (FERC cannot "arbitrarily ignore unrebutted, legally significant evidence" (cleaned up)).

---

[10] "[A]dvanced-stage" merchant HVDC projects that would foreseeably be completed during applicable time horizons would be relevant to an accurate understanding of the future electric system, even if they are "not yet built" when the planning process begins. R.859 Invenergy Rehearing Request 2-4 & n.5; R.483 Invenergy Initial Comments 6-7; *contra* R.976 Order 1920-A P331.

FERC also suggested that any discrimination against merchant providers could be addressed in "other proceedings." R.976 Order 1920-A PP333-34.  But the possibility of addressing undue discrimination *ex post* does not justify establishing an *ex ante* system that enables discrimination.[11]  Indeed, one of Order 1920's stated goals is to prospectively "remedy deficiencies" in transmission planning requirements, "to ensure that the rates, terms, and conditions for transmission service . . . [are] not unduly discriminatory or preferential."  R.813 Order 1920 P1.  Preventing discrimination against merchant developers is essential to achieving that salutary purpose.

A remand is necessary for FERC to remedy these errors and strengthen the planning process by mandating inclusion of merchant transmission facilities in the scenarios.

---

[11] Invenergy filed a complaint against MISO in 2022 for its failure to account for merchant HVDC in its long-range planning initiative. Three years later, FERC has taken no substantive action on it.  *See* Complaint, *Invenergy Transmission LLC v. Midcontinent Indep. Sys. Operator, Inc.*, Docket No. EL22-83-000 (Aug 8. 2022), Accession No. 20220808-5195.

## B. FERC's omission of energy storage from the alternative transmission technologies that planners must consider arbitrarily ignores its established use and substantial benefits.

FERC similarly erred by allowing transmission providers to ignore energy storage projects as an alternative to building new transmission lines. As FERC recognized, new technologies have developed over the last decade that can "improve the operation of new and existing transmission facilities and defer new transmission investments." R.388 NOPR P267. Because these "alternative transmission technologies" are often cheaper and easier to build than transmission lines, they have great potential to improve the grid at least cost. *See, e.g.*, R.813 Order 1920 PP1196, 1201. But the more transmission providers spend, the more they earn. *See* R.131 PIOs ANOPR Comments 7. Unsurprisingly, then, FERC found that regional planning processes "overlook or undervalue" these technologies, absent any requirement to consider them. R.813 Order 1920 P1194. Accordingly, FERC mandated that transmission providers evaluate four alternative transmission technologies. R.813 Order 1920 P1198. FERC selected these technologies because it found that their "potential advantages" in "identifying more efficient or cost-effective regional transmission" would "outweigh the potential administrative and analytical burden." R.813 Order 1920 P1208; *see also* R.813 Order 1920 PP1240-45 (detailing benefits of each selected technology).

45

Yet when FERC declined to include storage on this list, *see* R.813 Order 1920 P1245, it did not balance storage's potential benefits against potential burdens, contrary to the "fundamental norm of administrative procedure" that agencies "treat like cases alike." *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021) (quoting *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)). FERC simply ignored storage's benefits, despite evidence provided by the many commenters supporting it. *See* R.813 Order 1920 P1230 n.2632 (providing a diverse list of 23 commenters). As these commentors explained, storage can provide a cost-effective and flexible alternative to building expensive traditional transmission lines by maintaining safe voltage levels, controlling the timing of power flows, and reducing demand on the system at peak hours. *See, e.g.,* R.537 AEP Initial Comments 33-34; R.528 Clean Energy Associations Initial Comments 30; R.858 PIOs Rehearing Request 39. Nowhere did FERC "grapple with contrary evidence" to dispute the value that storage provides or properly weigh its benefits. *Sierra Club v. DOI*, 899 F.3d 260, 293 (4th Cir. 2018) (citation omitted). This failure arbitrarily treats like cases differently. *See Kirk*, 987 F. 3d at 321; *cf. Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011) (agency "inconsistently and opportunistically framed the costs and benefits" of its action).

Even if FERC could rely solely on the burden of identifying storage that can serve as transmission, its flimsy rationale still lacks support. FERC initially gestured at potential burdens, distinguishing storage as requiring "a case-by-case analysis." R.813 Order 1920 P1245. When PIOs pointed out that "*any* transmission solution requires a case-by-case analysis," R.858 PIOs Rehearing Request 40, FERC did not argue otherwise. Instead, it simply moved the goalposts, claiming that storage requires "an *additional* case-by-case analysis." R.976 Order 1920-A P607 (emphasis in original). Specifically, FERC found storage requires transmission providers to determine whether (1) a storage facility would act exclusively as a transmission asset; (2) it would get paid like any other transmission resource; and (3) building the facility would not affect the generator interconnection queue. *See* R.976 Order 1920-A P607.

But these kinds of criteria—does it qualify? how would it be paid? what effect would it have on other resources?—go into the evaluation of *any* alternative transmission technology (and most facilities in general). They are hardly reasons to exclude the evaluation of such a valuable resource. Indeed, storage differs from other technologies FERC omitted—such as topology optimization—that pose detailed technical challenges that could render that technology ineffective and even harm grid reliability. R.813 Order 1920 P1246.

47

Moreover, FERC's own guidance solved the problem it claimed prevented mandatory consideration of energy storage.  FERC's enumerated criteria for assessing whether storage could meet a specific transmission need provided sufficient guidance for transmission planners to consider storage in regional transmission planning.  This is precisely the kind of guidance PIOs and other parties identified in their requests for rehearing when they explained that FERC could require the use of storage in transmission planning to comply with some set of factors.  *See* R.858 PIOs Rehearing Request 42; R.857 Clean Energy Associations Rehearing Request 27. Moreover, use of storage as a transmission asset is not a new concept, and some providers already permit the use of storage for transmission services.[12]  FERC thus failed to demonstrate that storage has an undue administrative burden outweighing its benefits in contributing to more efficient transmission planning.

Finally, FERC's observation that transmission planners *may* consider storage is cold comfort.  *See* R.976 Order 1920-A P607.  FERC required transmission planners to consider alternative transmission technologies because it found that they were not doing so.  R.813 Order 1920 P1195.  And it offered no "reasoned explanation" to expect a different result for storage going forward.  *See Sierra*

---

[12] For example, California Independent System Operator, MISO, ISO-New England, and Southwest Power Pool all have tariff provisions allowing for storage as transmission. R.858 PIOs Rehearing Request 39.

*Club*, 64 F.4th at 502. Without required consideration of storage, consumers will suffer as transmission providers continue to leave this valuable alternative on the table in favor of more costly solutions.

### C. FERC failed to rationally justify its decision to narrow the required benefits analysis, which will result in costly and inefficient transmission that fails to comply with bedrock utility law.

One of the most critical functions of transmission planning—and one of the biggest failures of the Order 1000 process—is the proper assessment of transmission projects' benefits compared to their costs. This assessment plays two essential roles in the Order 1920 process: the project selection process relies on it to maximize bang for the buck; and the cost allocation process relies on it to determine who pays and how much. Underestimating project benefits thus leads to inefficient choices and inaccurate cost allocation. FERC found that without an accurate assessment of benefits, providers "cannot be reasonably expected to identify, evaluate, and select more efficient or cost-effective regional transmission," necessary for just and reasonable rates. R.813 Order 1920 PP722-23. It also found that mandatory benefit analysis aids cost allocation. R.813 Order 1920 PP722-23. Yet, in defiance of its own logic and without meaningful explanation, Order 1920 permits planners to ignore significant benefits FERC itself had earlier said should be considered. *Defs. of Wildlife*, 931 F.3d at 352 ("Absent a

reasoned discussion of the agency's apparently contradictory positions . . ., we can only conclude . . . [it] acted arbitrarily").  FERC's decision also violates bedrock utility law requiring transmission costs to be allocated roughly commensurate with the estimated benefits of the transmission facility.  *See Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009).

### 1. Substantial evidence supports mandating assessment of the four excluded benefits.

FERC has been clear: transmission providers are not properly assessing the benefits of potential projects, because Order 1000 does not require them to do so. R.813 Order 1920 P118; R.388 NOPR PP53, 176.  As a result, less efficient and cost-effective projects get built, and consumers pay more but get less.

To remedy this, FERC proposed twelve benefits for providers to evaluate when selecting transmission facilities.[13]  FERC described how each benefit was uniquely useful in the project selection process and provided detailed analysis on how providers could measure the benefits.  *See* R.388 NOPR PP189-225.  While FERC did not initially mandate benefit assessment, R.388 NOPR P184, the Final Rule determined that transmission providers are unlikely to consider relevant benefits unless required to do so.  R.813 Order 1920 P723.

---

[13] R.388 NOPR P185.

But FERC narrowed the list to seven, R.813 Order 1920 P720, allowing providers to ignore four benefits the NOPR had already determined should be evaluated: (1) access to lower-cost generation, (2) deferred generation capacity investments, (3) increased competition, and (4) increased market liquidity.[14] FERC asserted it was only mandating assessment of benefits that: "have a proven track record, can be discretely measured, and are unlikely to cause duplication." R.813 Order 1920 P724. Yet FERC neither applied these three criteria to the omitted benefits, nor refuted the overwhelming evidence in its own proposal that all four benefits *meet these criteria*.

### a. Access to lower-cost generation

Benefits from access to lower-cost generation refers to savings to consumers who can access distant, cheaper electricity generation sources that they could not otherwise access without the proposed transmission project. R.388 NOPR P216. Such benefits easily meet FERC's criteria.

Lower-cost generation benefits can be discretely measured by comparing status quo higher-cost local generation to future lower-cost distant generation in areas where the new project will be built. R.388 NOPR P217.

---

[14] Petitioners do not challenge FERC's exclusion of the "mitigation of weather and load uncertainty" benefit, given FERC's addition of elements of this proposed benefit to the "mitigation of extreme events and system contingencies" benefit in the Final Rule. *See* R.813 Order 1920 PP800, 820 n.1820.

These benefits also are not duplicative.  FERC explained why: although similar to production cost savings—which FERC *did* include in the Final Rule— that methodology does "not adequately capture" the benefits from accessing lower-cost generation.  R.388 NOPR P218.  Specifically, there are distinct savings from opening access to cheaper, more distant generation to maintain reliability during times of high demand, transmission or generator outages, and other operational issues like forecasting errors.  R.388 NOPR P218.  And FERC cited additional evidence in the proposal that further explains that production cost savings simulations will "not capture the lower overall generation investment costs." R.131 Brattle-Grid Strategies Oct. 2021 Report 46-47; R.388 NOPR P218 n.351.

Finally, access to lower-cost generation has a proven track record of providing particularly significant savings. One estimate found that savings from this benefit alone would exceed the entire $14-17 billion cost of a portfolio of proposed transmission projects.  *See* R.858 PIOs Rehearing Request 6 n.17 (citing ACORE, Enabling Low-Cost Clean Energy and Reliable Service Through Better Transmission Benefits Analysis: A Case Study of MISO's Long Range Transmission Planning, at 8 (Aug. 2022), https://perma.cc/GN2K-6NBF).  Another found savings of $12 million per year for a single project that allowed California to meet reliability requirements by importing low-cost generation from Arizona.  Half

of these savings would go directly to consumers.  R.131 Brattle-Grid Strategies

Oct. 2021 Report 47; R.388 NOPR P216.

### b. Deferred generation capacity investments.

Benefits from deferred generation capacity investments meet FERC's

criteria, too.  These benefits capture the way new transmission facilities can

increase the value of *existing* generation by enabling resource-constrained areas to

import more power from neighboring regions.  *See* R.388 NOPR P214.

Transmission and generation are often substitute products, such that new

transmission facilities can defer (or sometimes, eliminate) the need for additional

investments into generation capacity in resource-constrained areas.  *See* R.388

NOPR P214.

Here too, FERC found this benefit to be quantifiable, with a track record of

consumer savings.  *See* R.388 NOPR P215.  One study found that transmission

facilities used to import electricity from Arkansas and Louisiana into eastern Texas

meant that "additional generation capacity investments were not needed" there,

R.388 NOPR P214, enabling existing power plants to shift focus to serving more

resource-constrained portions of the state.  R.131 Brattle-Grid Strategies Oct. 2021

Report 44-45.  These transmission facilities resulted in economy-wide benefits of

an estimated $320 million, split evenly between Texas customers and out-of-state

merchant generators.  R.131 Brattle-Grid Strategies Oct. 2021 Report 44-45.

53

Another analysis found that a transmission project that increased transfer capability would create approximately $400 million in economy-wide benefits. R.131 Brattle-Grid Strategies Oct. 2021 Report 45.

### c. Increased competition

Nor was there a basis to exclude benefits from increased competition, which are "reduced bid prices in wholesale electricity markets due to increased competition among generators and reduced overall market concentration." R.388 NOPR P219. As FERC outlined, there are multiple established methods for calculating increased competition benefits, all of which transmission providers have used to estimate what are often enormous monetary savings. R.388 NOPR PP221-24. For instance, one provider estimated that the increased competition supplied by just one proposed transmission project would provide $28 million in additional annual benefits, offsetting approximately 40% of the annual project costs. R.131 Brattle-Grid Strategies Oct. 2021 Report 49. Another set of transmission projects had estimated competitiveness benefits offsetting 50 to 100% of project costs. R.131 Brattle-Grid Strategies Oct. 2021 Report 49.

### d. Increased market liquidity

Increased market liquidity—which "enabl[es] a larger number of entities, both buyers and sellers, to participate in a market"—warrants the same treatment. R.388 NOPR P225. Increasing market participants provides several benefits,

including reducing transaction costs and increasing pricing transparency.  R.388

NOPR P225.  FERC explained that these benefits are quantifiable and help drive

down energy prices for consumers.  R.388 NOPR P225.  For example, "bid-ask

spreads for bilateral trades at less liquid hubs have been found to be between $0.50

to $1.50 [per megawatt hour] higher than the bid-ask spreads at more liquid hubs."

R.388 NOPR P225.  Even a small reduction in these bid-ask spreads—such as

$0.10 per megawatt hour—could save up to $40 million dollars per year for a

single trading hub, or $500 million annually nation-wide.  *See* R.131 Brattle-Grid

Strategies Oct. 2021 Report 50.

### 2. FERC arbitrarily allowed transmission providers to ignore these four benefits.

FERC decreed that the seven benefits it mandated were "sufficiently broad"

to ensure more efficient or cost-effective transmission solutions.[15] R.813 Order

1920 P821.  FERC stated that it only mandated benefits that "have a proven track

record of cost savings, can be measured, and are unlikely to cause duplication,"

insinuating that the four omitted benefits do not meet these criteria.  *See* R.813

Order 1920 P724.  But FERC never engaged with its own findings and evidence to

---

[15] Unlike its decision to expand one benefit to include benefits from mitigation of weather and load uncertainty—which FERC explained in detail, *see* R.813 Order 1920 PP800-05—FERC does nothing to explain how the remaining seven benefits cover the other four benefits it excluded.

the contrary.  R.976 Order 1920-A P414; *cf.* Section II.C.1 *infra*.  FERC thus failed

to "examine the relevant data and articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made."

*State Farm*, 463 U.S. at 43 (cleaned up).  Based on FERC's own evidence, the list

of seven benefits is too narrow to fully achieve the remedial promise of Order

1920.

 If anything, FERC's findings in the Final Rule only undermine its decision

to exclude the four benefits.  FERC required consideration of specific benefits

because it expected that transmission providers would not otherwise consider a

sufficiently broad set of benefits when evaluating potential transmission projects.

R.813 Order 1920 PP723, 725, 727-28; R.976 Order 1920-A P377.  Indeed, FERC

explained that the benefits of regional transmission projects generally "extend

beyond the benefits that transmission providers currently consider as part of their

regional transmission planning and cost allocation processes."  R.813 Order 1920

P722.  If transmission providers are not required to consider certain benefits, their

track record demonstrates they will not do so.  Given FERC's own analysis of the

four benefits, its decision to allow providers to ignore them could result in billions

of dollars in lost cost savings, seriously undermining the remedy FERC has

determined is necessary to secure just and reasonable rates.

### III. This Court Should Remedy the Specific Errors Addressed Herein, Without Undercutting Order 1920's Beneficial Improvements.

Petitioners request that the Court remand for FERC to correct the shortcomings in its orders explained above, but craft a remedy that does not jeopardize progress in the interim toward Order 1920's significant and beneficial transmission planning reforms. The record shows that these reforms are necessary to fix a broken status quo, in which systemic failures to properly plan transmission infrastructure stifle competition, undermine grid reliability, and impose significant and excessive costs on consumers. R.813 Order 1920 PP85, 87, 112; *see, e.g.*, R.131 PIOs ANOPR Comments 30-57. Although Order 1920 should be strengthened, the need to implement its existing requirements is particularly urgent, given rapidly increasing energy demands from economic development, electrification, and industrial growth. R.813 Order 1920 P95.

When granting relief, appellate courts appropriately tailor their remedies in light of the relief sought by the petitioner. *See Minyard Enters., Inc. v. Se. Chem. & Solvent Co.*, 184 F.3d 373, 386 n.14 (4th Cir. 1999) ("[A] remedy desired by none of the parties should not be forced upon them."); *cf. Lancaster v. Sec'y of Navy*, 109 F.4th 283, 289 (4th Cir. 2024) (complainant may choose "which remedies to pursue"). Petitioners' request for a remand—without setting aside Order 1920's existing requirements—is consistent with the Court's discretion over the form of remedy. *See* 16 U.S.C. § 825*l*(b) (authorizing Court "to affirm, modify, or set aside

57

such order in whole or in part"); *cf. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 311-12 (1974) (holding that an appellate court did not exceed its statutory authority "'to affirm, modify, or set aside an order in whole or in part'" and "[]properly exercised" its "equity powers" when it authorized FERC to partially revisit its order).[16]

Other courts have appropriately recognized that in some situations, the proper remedy is to remand without setting aside the agency order on review. *E.g.*, *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022); *Texas Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 389-90 (5th Cir. 2021). This is particularly true when the petitioner itself seeks that form of relief. *See Del. Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 469 (D.C. Cir. 2021) (not vacating where petitioners "expressly abjure[d]" that remedy); *Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990) (same, where vacatur "would at least temporarily defeat petitioner's purpose"); *cf. NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 493 (D.C. Cir. 2014) (declining to vacate where it "would lead to an entirely unregulated market," and complainants sought stronger restrictions). As in those cases, setting aside Order 1920 during remand would frustrate the improved

---

[16] Courts construe the Natural Gas Act's and Federal Power Act's "substantially identical" judicial review provisions in parallel. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981).

transmission planning Petitioners seek to protect. *See Env't Def. Fund*, 898 F.2d at 190.

Petitioners' requested remedy also comports with severability principles. Courts confronting flawed statutes or regulations "try to limit the solution to the problem" by "severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (cleaned up). Severability is often appropriate where parties challenge a requirement adopted as part of a broader rule. *See, e.g.*, *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187-90 (D.C. Cir. 2022) (finding erroneous inclusion of certain generators severable from overall reliability program). Here, Petitioners generally support Order 1920's planning process and do not seek to remove specific requirements. The "problem[s]" they challenge, *see Free Enter. Fund*, 561 U.S. at 508, are FERC's failures to include *additional* requirements. Petitioners therefore seek a remedy limited to those problems: a remand for FERC to fix those omissions. In the interim, leaving intact Order 1920's existing requirements effectuates FERC's intent by retaining the planning process it promulgated. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) (en banc) (severability turns on "agency intent" (cleaned up)). And Petitioners' requested remedy maintains Order 1920's "primary purpose," *id.* at 293, namely, redressing

59

the absence of long-term regional transmission planning and excessive costs. *See* R.813 Order 1920 P85.

## CONCLUSION

For the foregoing reasons, the Court should grant the petitions and remand to FERC.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument given the complex nature of the case and its significant ramifications for the public, and that the Court hold argument during its 2025-2026 term if practicable. *See* ECF No. 315-1 at 10.

Respectfully submitted,

*/s/ Danielle C. Fidler*
Danielle C. Fidler
Veronica Saltzman
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 202-285-0926
Email: dfidler@catf.us

Alexander Tom
Ada Statler
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: 206-343-7340
Email: ldavisstermitz@earthjustice.org

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-717-8341
Email: creiser@nrdc.org

*Counsel for Natural Resources Defense Council*

William S. Scherman
Jeremy C. Marwell
Jeffrey M. Jakubiak
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202-639-6507
Email: jmarwell@velaw.com

Garrett T. Meisman
845 Texas Avenue
Suite 4700
Houston, Texas 77002
Phone: 713-758-2559
Email: gmeisman@velaw.com

*Counsel for Invenergy Solar Development North America LLC, Invenergy
Thermal Development LLC, Invenergy Wind Development North America
LLC, and Invenergy Transmission LLC*

Nicholas J. Guidi
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Phone: 202-573-8136
Email: nguidi@selc.org

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*


Justin Vickers
Sierra Club
1229 W Glenlake Ave
Chicago, IL 60660
Phone: 224-420-0614
justin.vickers@sierraclub.org

*Counsel for Sierra Club*


Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street, N.W., Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Dated: August 29, 2025

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1756        Caption: Invenergy Solar Development North America LLC v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Invenergy Wind Development North America LLC
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?        ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Invenergy Wind Development North America LLC is a privately held subsidiary of Invenergy Renewables LLC, Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                        ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell                          Date:          8/29/2025

Counsel for: Invenergy Wind Development North America LLC

Print to PDF for Filing

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__     Caption: __Appalachian Voices et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Appalachian Voices__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi _____      Date: _____08/29/2025_____

Counsel for: Appalachian Voices _____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1650        Caption: Appalachian Voices v. FERC (consolidated)

Pursuant to FRAP 26.1 and Local Rule 26.1,

Environmental Defense Fund
(name of party/amicus)


who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?　　☐YES☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)　☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?　　☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?　　☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __Theodore Kelly_____      Date: _____8/28/2025_____

Counsel for: __Environmental Defense Fund_____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__    Caption: __Appalachian Voices et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Energy Alabama__
(name of party/amicus)

_____

 who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                    Date:        08/29/2025

Counsel for: Energy Alabama

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1756__    Caption: __Invenergy Solar Development North America LLC v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Invenergy Solar Development North America LLC__
(name of party/amicus)

_____

who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Invenergy Solar Development North America LLC is a privately held subsidiary of Invenergy Renewables LLC, Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell            Date:            8/29/2025

Counsel for: Invenergy Solar Development North America LLC

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1756__      Caption: __Invenergy Solar Development North America LLC v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Invenergy Thermal Development LLC__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Invenergy Thermal Development LLC is a privately held limited liability company with parent entities Invenergy Thermal Global LLC, Invenergy Energy Transition LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?          ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell                    Date:        8/29/2025

Counsel for: Invenergy Thermal Development LLC

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1756__      Caption: __Invenergy Solar Development North America LLC v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Invenergy Transmission LLC__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐ YES  ☑ NO


2.      Does party/amicus have any parent corporations?      ☑ YES  ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

        Invenergy Transmission LLC is a privately held subsidiary of Invenergy Renewables LLC, Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐ YES  ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?            ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?            ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?        ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell                    Date:        8/29/2025

Counsel for: Invenergy Transmission LLC

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__South Carolina Coastal Conservation League__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                    Date: _____08/29/2025_____

Counsel for: SC Coastal Conservation League

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1650_      Caption: _Appalachian Voices et al. v. Federal Energy Regulatory Commission_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Southern Alliance for Clean Energy_
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                             ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                             ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi _____          Date: _____08/29/2025_____

Counsel for: Southern Alliance for Clean Energy ___

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__    Caption: __Appalachian Voices et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__North Carolina Sustainable Energy Association__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                    Date:         08/29/2025

Counsel for: NC Sustainable Energy Association

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1650_        Caption: _Appalachian Voices, et al v. FERC_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Natural Resources Defense Council_
(name of party/amicus)

_____

 who is _____petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.      Does party/amicus have any parent corporations?              ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?              ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Veronica Saltzman          Date: 08/27/2025

Counsel for: Natural Resources Defense Council

- 2 -

[Print to PDF for Filing]          [Reset Form]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1650          Caption: Appalachian Voices v. FERC et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sierra Club
(name of party/amicus)

who is _____ petitioner _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Justin Vickers _____     Date: August 26, 2025

Counsel for: Sierra Club _____

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. **24-1650(L)**    **Caption:** Appalachian Voices, et al. v. FERC

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. <u>See</u> Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as `Courier New`) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains _____547_____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
Times New Roman, 14-pt, serif font _____ [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Danielle Fidler _____

Party Name **Nat. Res. Def. Council** _____    Date: 8/29/25 _____

# CERTIFICATE OF SERVICE

**Instructions for Electronic Filers:** For persons filing electronically, CM/ECF serves all registered CM/ECF users, and no certificate of service is required for such service. A certificate of service is required from an electronic filer, however, in the following circumstances:

- To certify that a non-user of CM/ECF has been served;
- To certify that a manual filing (not available in electronic form), has been served;
- To certify that a sealed document has been served;
- To certify that a case-initiating document, such as a petition for review, petition for permission to appeal, or petition for writ of mandamus, has been served.

**Instructions for Paper Filers:** For persons filing in paper form, service must be accomplished outside CM/ECF, and a certificate of service is required for all documents.

Case No. ___24-1650___    Case Caption _Appalachian Voices, et al. v. FERC_____

I certify that on _August 29, 2025_, the _Opening Brief of Public Interest Organizations and In_
              (date)                     (document title)
was served by [  ] personal delivery; [  ] mail; [  ] third-party commercial carrier; or [  ] email

(with written consent) on the following persons at the addresses or email addresses shown:

(Name and Address or Email Address )
Service provided electronically by CM/ECF.

_____          _August 29, 2025_____
Signature                                        Date

| Print fo PDF for Filing | Reset Form |
|---|---|

01/28/2020 SCC